Good morning. My name is Grace Palacio for the Office of the State Appellate Defender. May it please the Court, my name is Grace Palacio and I represent the defendant Elliot Robinson. Mr. Robinson's opening brief raised five issues, but for the purposes of this oral argument, I will limit my discussion to the first two issues raised in his brief. One, whether the introduction of Central Collins' dying declarations violated the Confrontation Clause, and two, whether the trial court should have excluded the tool mark and firearms evidence in this case, or at the very least, conducted a fry hearing on its admissibility. I'll also reserve a few minutes for rebuttal if that's okay. Yes, thank you, Counsel. On October 12, 2005, Central Collins was shot multiple times. In the ambulance, upon questioning by the paramedic on the way to the hospital, Collins stated that Elliot from 71st and Champlain shot him over a stolen gun. Before trial, Robinson moved to exclude Collins' statements. The trial court denied the motion. The trial court erred because the admission of the dying declarations violated the Confrontation Clause. In Crawford v. Washington, the U.S. Supreme Court reinterpreted the Sixth Amendment right to confrontation when it held that out-of-court testimonial statements by unavailable declarants are inadmissible. Counsel, if I could just interrupt you. One thing that I noted in the brief is that it's not given too much attention, and I'd like to see if this Court should consider the issue of where the statement was actually given, if that's relevant to this Court's consideration. Yeah, it's absolutely relevant. And the Courts make clear that whether something is considered testimonial or non-testimonial is highly context-oriented. So looking at this case, this happened in an ambulance to a paramedic on the way to the hospital. It's no longer at the scene. This lends more towards it being a testimonial statement, not something that is given at the scene to deal with an ongoing emergency. If we want, we can contrast it with other cases like Michigan v. Bryant in which the statements were made to a police officer at the scene. Well, doesn't the State argue that the perpetrator was still out there? They didn't know where the perpetrator was. They didn't know if they had been apprehended. He or she had been apprehended. So wasn't there still a state of emergency when the question was asked of Mr. Collins? Well, yes. The statements came after the shooting. But Bryant recognizes specifically that just because someone is still at large does not necessarily mean the entire time someone is at large that there's an ongoing emergency. You still need to look at the details of what's happening. You need to look at the declarant. What is his statement? Is he thinking about when he's making these statements? What does a reasonable person in that position think? Is he thinking that by giving these answers, is he saying something that would go towards the prosecution of whomever had committed this offense? So if you look at the facts of this case, Collins has already been told that his injuries are fatal, that he's not going to make it. So when this paramedic speaks to him and says, what happened? Who did this? He says, Elliot from 71st. He's clearly identifying a person. I'm a little confused. I thought the facts were that Mr. Collins was lying on his back in the rear garden of 7131 South Champlain when he spoke with the paramedic, Sennett, and that Sennett testified that he was alert, he was conscious, and he was asking questions about his birth and address. And I thought, so wasn't the conversation, hadn't it already happened? That he was responding to Sennett's questions? My understanding of the facts is by the time the paramedics arrived at the scene, there are already fire trucks there, there are some police officers, and they're loading Collins into the ambulance. And during the ride to the ambulance, while they're loading him up, one of the paramedics is going to the front, the other one's taking care of Collins. That's when these questions begin to happen. What happened? Who did this? What was it about? Those kinds of questions. So the scene's already been secured by officers and other fire trucks and that kind of nature. So what's happening now is he's being transferred to the hospital. He's been made aware that he's no longer going to make it. And so he's being asked these questions, and he understands that any reasonable person would understand. By answering these questions, he's trying to pinpoint who did this to him so this person can be prosecuted. Any reasonable person would think that, especially since when you look at these kinds of questions, he's pinpointing where this person is. And he's not seeking aid. He already knows that he's going to die. Justice Scalia says in the dissent in Bryant that, you know, if he knows he's going to die, then what other purpose can he have other than to prosecute this person, other than to give these facts? So are you arguing that the paramedics do not need to know this information? In terms of taking care of him, I wouldn't say that knowing the reason for the shooting is necessary to the paramedics. That's not dealing with the ongoing emergency of what they're dealing with. They're there to take care of him. These are the kinds of questions that a police officer would ask in terms of trying to find out facts that you would then establish at trial in order to prosecute someone. These are clearly testimonial statements, and any person in Collins' situation would understand that this is what these questions are going towards. Can I roll you back a little bit? Sure. From the arguments that are being made today and in the briefs, you appear to not dispute that these statements are admissible in the first place on an evidentiary basis as dying declarations. No, I don't dispute that they're dying declarations. Do you dispute whether there's a proper foundation for dying declarations? I dispute whether or not, well, one, given what Crawford says, that these kinds of testimonial statements are inadmissible because they are not subject to cross-examination. They violate the Confrontation Clause. And two, just arguing generally, that dying declarations, by their very nature, violate Crawford and their understanding of what the Confrontation Clause requires. Okay, maybe we're splitting hairs because that was the second part of my question. I mean, they still have to fit in some kind of exception. I mean, they have to have some evidentiary basis. Right, so dying declarations would historically have been the exception under which they would have been allowed in. But I think in the context of Crawford and its progeny since then, the Court makes clear that these kinds of testimonial statements, if they're not subject to cross-examination, are simply inadmissible because they violate the Confrontation Clause. So putting the Crawford issue aside, do these meet the requirements of a dying declaration? Yes. Okay, so you do agree with that. Yes. But you do dispute that Crawford has not made an exception for these common law types of dying declarations. Right, I argue that dying declarations are simply incompatible with Crawford. And what the Court has been saying, Crawford requires, you need confrontation, you need the ability to cross-examine. And we simply just can't make an exception for historical purposes when the Court has made clear that reliability of these testimonial statements are of the utmost importance. But hasn't this Court already held that dying declarations are admissible as an exception to Crawford? And why are you asking us to rule differently in this case? Well, I would argue, one, the U.S. Supreme Court has specifically not addressed this issue. In a footnote to Crawford, they acknowledge that, you know, dying declarations may be an exception. But Justice Ginsburg, in her dissent in Bryant, says, you know what, dying declarations, that is something that I would like to address. We need to figure out whether or not this exception can still survive Crawford analysis. And so while it hasn't, while other courts have said, you know, maybe there's a historical exception, the U.S. Supreme Court has specifically left open the possibility that, you know, it just would not survive their analysis of Crawford and what the Confrontation Clause requires. And I would just argue, you know, if we're going to talk about the historical context of this, the reason why dying declarations was held to be admissible is because historically they were found to be inherently reliable. Because people were far more religious. They assumed that, you know, if you were going to die, you were going to speak the truth. So those are inherently reliable statements. In this more modern secular world that we live in now and under Crawford, they just flat out reject the idea of inherent reliability. Reliability, according to the Supreme Court in Crawford, only comes through cross-examination. Dying declarations doesn't allow for that. It violates Crawford and the Confrontation Clause. Isn't one of the contexts of the reliability of a dying declaration is that the declarant believes that they're either going to die or near death? And that's one of the basis for reliability. And Mr. Collins here made the inquiry whether or not he was going to die or not. And when the paramedic mentioned that he was, and he gives the statement, isn't that then therefore reliable based on the fact that he knew he was going to be dying? I don't know that that is an assumption that we can make. Yes, it's something to consider that he knew he was at death's door. But Justice Scalia makes the point in Bryant by saying, you know, the fact that you know you're going to die, that probably makes it so what you want to do is, you could have any reasons to say these things, but what you want to do is to prosecute someone. And if you're going to be presenting evidence to prosecute someone, it needs to be subject to cross-examination in order to determine reliability. You can't just rely on inherent reliability for something that just cannot be challenged in the proper way. Moving on to the second issue. Counsel, couldn't he just as easily, I mean, you're interpreting his reasons for giving his dying declaration. Couldn't he just have wanted to confess in terms of his participation in dealing with the gun? I don't think it reads that way. The questions are, who did this? Elliot from 71st and Champlain. That the issue was about a stolen gun. Over a stolen gun. Right. And part of the stolen gun, I think, is undeniably testimonial. What does that have to do with an ongoing emergency? But even aside from that, those specific kinds of answers and questions, those are the things you would want to prove in a prosecution. I don't know how that relieves Collins of any kind of sense of wrongdoing or guilt. He's obviously trying to explain what happened, who did it, and why. No other questions? So the second issue is whether the tool marks and firearms evidence should have been excluded. Or at the very least, the trial court should have held a fry hearing on the admissibility of tool mark and firearms evidence. No gun was recovered in this case. Carolyn Tucker was qualified as an expert in the field of firearm identification. And she testified that she received five fired cartridge cases in relation to this specific shooting. Peter Brennan was also qualified as an expert. And he said that he received and analyzed cartridge cases from an armed robbery that had happened months before. He then looked at the cases, and he said that the cases from both cases matched. Before we get into the testimony, can you address the issue of whether or not Mr. Robinson forfeited this issue because it wasn't raised in his post-trial motion? Mr. Robinson's? This issue in particular? Right. I believe it was raised, and he has a motion in limine. It's raised in the post-trial motion. I believe it's preserved. I think the record shows that it wasn't in the post-trial motion, but proceed. I would argue even if not preserved in the post-trial motion, it's clear from the record that it was challenged and litigated below and should therefore be preserved. It's fully on the record as the basis for this argument. Okay. So in Illinois, the admission of expert scientific testimony is governed by the Frye General Acceptance Test. Tool marks and firearm identification is based on the premise that each firearm will transfer a unique set of marks known as tool marks to ammunition fired from that gun. So in theory, if cartridges were fired from the same gun, the examiner would see sufficient patterns of matching marks. The question here then is if these conclusions are generally acceptable scientific principles. Here, the ballistics evidence should have been excluded because tool marks and firearm evidence is not generally accepted science. In 2009, the National Research Council report concluded that the validity of tool mark and firearms analysis has not been fully demonstrated. This committee was made up of members of the forensic science and legal communities, scientists, statisticians, experts in this field who, upon looking at this area, determined that neither the methodology or the premises upon which tool marks and firearms evidence and analysis is based has been properly tested or has been shown to be reliable. They argue that there's no showing of a rate of error, there are no peer reviews, everything is subjective based on what these specific examiners say they see. There just has not been enough tests shown to say that this kind of testing is reliable. Therefore, because it's not generally accepted, the court should have excluded them. Alternatively, the court should have at least had a Fry hearing on this case because these studies and challenges across the country to tool mark and firearms analysis shows that this is new and novel. It's a new and novel science because scientists are arguing these days that, like I just said, this is just not something that has been shown to be reliable. And because the court did not consider these things, a Fry hearing should have been held on the matter. Hasn't this type of evidence already been considered by this court and other courts since the day of People v. Fisher, which was back in the 30s? The problem with cases like Fisher that go back in the 30s is that science is always changing. The landscape has changed. We have to think of the advances in science. So what may have been acceptable in 1930 can constantly be challenged. We've had other cases in this state with, like, HGN testing, where things that used to be admissible, things that used to be deemed reliable, no longer are because more modern, current challenges have shown that maybe there's a question as to this reliability. We cannot simply look back at what has been done in the past when new changes in technology show that these are not as reliable as we once assumed. So given the novelty of this kind of science, there should have been a Fry hearing. That's what the Illinois Supreme Court in McCown has demanded. When there has been historical challenges and there hasn't been a Fry hearing on these types of sciences, then you need to have one to determine whether or not this is a generally accepted science. But the same issue based on these reports haven't been considered by some federal courts. They have been considered by some federal courts. And they have questioned the reliability of it, too. And I think the particular problem in this case is that the trial judge didn't even have any kind of hearing other than saying, you know what, I think the experts are just looking at stuff, and that's not a scientific process, so Fry doesn't even apply. There was no consideration of these types of peer reviews or whether or not there's error, like, rates of error known. He just made a general assertion that, you know, it's not a scientific process, so Fry doesn't even apply here. But he limited the scope of the opinion. He limited it, but on the one hand, he limited it without fully understanding all the different variables. He didn't, like I said, he didn't talk about peer review or rates of error. He just said, well, you can't tell them it's a science. And even with that limitation, Peter Brennan still testified as to scientific principles. And the problem with saying that you just can't say it's a science, it still leaves the impression with the jury that something is science, that means it's truth, that means it's fact. And then the state goes on in the closing arguments to argue, well, you know, because Elliot Robinson showed that he committed this offense because he shot here and he shot there and the cartridges matched, then clearly he's the person who committed this offense. Nothing about what the trial judge had done in terms of limiting this testimony signaled to the jury in any kind of way that what these experts were saying weren't, in fact, the truth. Or there was a question about the reliability of their so-called conclusions. You mentioned that there's cases out there that did not allow this type of evidence to come in. Which cases are those? I can point to the sites to United States versus Suburban, saying that they had also considered, you know, other cases where courts have talked about the reliability of this kind of evidence. But even Suburban doesn't support the state's argument as much as it would seem from their brief, because Suburban specifically noted that we can't just rely on past case law to say that something's reliable. They still said that this kind of evidence required a, quote, unquote, exhaustive hearing. There needs to be a foundation laid as to reliability so correct and specific and clear limitations can be laid for what kind of evidence can be brought in and what can be explained to the jury. This was not done in that respect at all in this case. The judge just said it's not a science. FRI doesn't apply. So because tool mark and firearms evidence is not generally accepted, I would argue that this evidence should have been excluded, or at the very least there should have been a FRI hearing on the matter. Okay. Thank you, counsel. Good morning. May it please the Court. My name is Clayton Fisher. I'm an assistant state attorney on behalf of the people. Turning to the first issue, Your Honors, we have to recall what exactly happened in Crawford. Crawford was an examination of what the Confrontation Clause meant in 1787. That was the baseline. What Justice Scalia was doing, he was looking back to see what did confront the witnesses mean in 1787. And Crawford did not involve a dying declaration. However, as mentioned earlier, footnote number six points out explicitly that, at common law in 1787, dying declarations were admissible and reliable. And he goes on to say in the footnote it was really the only exception existing at common law. And so the question of whether it's testimony or not may be moot because it was a special exception. The second district in Gilmore and then this court in 2009 in Graham both found that, based on that footnote, that the Confrontation Clause did not exclude dying declarations. We've mentioned the Michigan v. Bryant case. It's interesting in Bryant because we have a case that involves an excited utterance, which is not something that existed in 1787, and it's made to police officers. And the court in that case found it to be a non-testimonial situation. This case is a clear dying declaration. As defense has conceded today, although at trial they argued that it was not a proper dying declaration, evidently now we've shifted to it was a proper dying declaration under the dying declaration law. It just doesn't meet Crawford. But what about your opponent's insistence that the whole purpose and the only purpose that the seating could have had was for the purpose of prosecuting the person who had done this to him, and therefore it was, in fact, testimonial and should have been subject to cross-examination and testing? Your Honor, we would only get to the testimonial versus non-testimonial issue if, in fact, Crawford applied. If Crawford does not apply, in other words, if that footnote has meaning, and if this court's ruling in Graham and the other court's ruling in Gilmore have meaning, then we never get to the testimonial issue. And again, if we were to get to the testimonial issue, which I don't think we should, the fact that in Bryant we have statements to police officers and those are okay, here we have statements to paramedics. And this is an interesting statement because what happened here, Your Honor, it asks where the statement took place. It is true that originally the beginning of the statement takes place when the paramedics come in. It's the fire department who has already started to patch this guy up. Paramedics come up to the backyard. The man is bleeding profusely. They ask him some questions. He knows who he is. He knows where he lives. He is coherent, which is an important factor in a dying declaration. The statements about who did this and where it happened, those did take place in the ambulance itself. There were two witnesses to that statement. They're both paramedics. They're not police officers. Their primary function is to give aid to this man. The paramedic sent it was very honest. He said that the man looked at me. I looked at him. He was bleeding all over. I've done thousands of gunshot cases. He asked me, am I going to die? I told him the truth. He said, son, I'm afraid you're going to die. At that point, they talked about, do you want us to tell anybody anything? That part was excluded from the trial. I don't think it should have been, but it was excluded from the trial. In the motion, the paramedic did say that the man, tell my sister or my mother I love them and things like that. Then Elliot, Elliot who? Elliot at 71st and Champlain. Then what was this about? A stolen gun. Can you address the issue about the emergency, given the fact that they're in an ambulance and I'm assuming they're locked in an ambulance and for all intents and purposes safe, the perpetrator's not around? Well, we don't know that the perpetrator's not around, just like we didn't know where the perpetrator was in Bryant. I think it's just the same. There is a man out there with a gun who's just shot somebody multiple times on the street. I think the emergency situation is the same, but, again, I don't think we have to get there because, again, in Bryant it was not a dying declaration. Now the man did die, but you didn't have the factor in Bryant of a person being confronted with the recognition that you're going to die or do you know you're going to die or something. There have been cases where doctors have talked about that and things like that. So the man in Bryant didn't know or didn't express the fact that he knew he was going to die. And I think he died several days later. It wasn't that this man died by the time they got to the hospital and were going through the front doors of the emergency room. He had died at that point due to loss of blood. So I think the emergency situation is certainly still present. So basically our argument is that it is not covered by Crawford because of that exception and because, in fact, in 1787 this exception existed. And even if it were, it would be the situation in Bryant with two police officers and not a dying declaration is less strong than the situation here where we have a dying declaration plus a statement to two paramedics. But the police officers have the authority to react to an emergency or to protect and address safety concerns, but paramedics cannot do that. They can tell somebody. I mean, obviously if there was something that they learned, the guy is still right over there or something, they could have called the police. I mean, the police were presumably coming to the scene or were already at the scene. They can relay that information to the police. So I think even though, but again, that also cuts both ways because the police, it's hard to say that the police aren't investigating at all times. And on the other hand, paramedics, their primary duty is not to investigate. And they were asking several things, including who can we tell because you're going to die. Now, that is a natural reaction of a person who's right there. And who did this and what happened is a natural question as well. It doesn't necessarily have to mean that they were going to run out and do something about it. Turning to the second question, Your Honors, in terms of the Fry hearing, the first thing I would point out is that respectfully, I don't really know that this court can rule on the issue of ordering a Fry hearing where the Illinois Supreme Court has already said that this is divisible evidence. In 1930 in the Fisher case, no relation, but the court went through the testimony at length of the expert that testified in that case. And it mirrors strikingly what the expert in this case, the background, the theory, the kinds of things that you look at. And the Illinois Supreme Court said this is admissible evidence. And as pointed in my brief, there have been hundreds and hundreds and hundreds of cases in this state for both the defense and the prosecution where firearms evidence has been accepted as proper evidence. Counsel, excuse me, but counsel argues that this is scientific testimony. It may be, Your Honors, but in McCown, the case that she talks about, you can either have a Fry hearing or you can rely on well-established judicial principles making the case and making the scientific evidence admissible, which is exactly what happened here. This isn't like the gaze test where there had been no court that had ruled this is admissible evidence on a scientific basis. And what did the trial court judge consider as to the second prong of the test? Second prong of the test? Well, there wasn't a Fry hearing, so they took judicial notice. They took judicial notice of the fact that Fisher and hundreds of cases after that have accepted this as scientific evidence. There is no novel or new test here. There's a new criticism of an old test. And the way to deal with that is through cross-examination or putting your own experts on, both of which were available. In this case, defense counsel did thoroughly cross-examine, or as much as they wanted to. The experts, are you aware of this study? Are you aware of the criticism of this study? One of the witnesses says, yeah, I've read it, but I haven't read it in depth. They were perfectly free to put anybody on they wanted to attack the validity. Interestingly, though, even in their brief, they've admitted that, well, the theory behind this is still okay. We just don't know. It hasn't been tested enough. But the fact is that there have been hundreds and hundreds and hundreds of these cases that the trial court could have relied on. And, of course, the Fisher case, an Illinois Supreme Court case, I would say the trial court wouldn't have had authority to not follow the Fisher case based on some new criticism. So the important thing is that McCown has said in the second prong that you can take judicial notice of prior decisions. And this prior decision in Fisher discussed all these factors. Now, yeah, it's 1930, but Frey was 1923. So now the court in Fisher did not apply Frey. But they were aware of Frey. You know, Frey had been around for seven years at that point. People were aware of it. And the Supreme Court in Fisher made very clear that this is legitimate, admissible scientific evidence. The Severn case that we cite in our brief is interesting because it actually collects all the new cases that have discussed this. It's a little different in the federal system because the federal system has a new standard, the Daubert standard, which the Illinois Supreme Court has rejected. So we're still a Frey state, but the federal courts are required to act under Daubert. Daubert has some new responsibilities. So several federal courts felt it necessary under the new Daubert standard to hold a hearing. And in none of those cases did they exclude the evidence. They limited in some cases what the experts could say, but they let the evidence in, and they let the other side cross-examine on that evidence. And Severn collects all that and says, you know, there's really no reason to have any more Frey hearings or Daubert hearings. This issue is settled. Those cases let the evidence in. We're going to let the evidence in, or I'm going to let the evidence in because it's a district court. So the issue is really, in those cases, whether or not Daubert applied. And even in those cases, the evidence has been coming in. So the defendant got the relief that is available under Illinois law, which is the ability to cross-examination. And had the defendant wanted to put on an expert, they could have put on the experts. And remember, in a lot of these cases, the defense uses this evidence to their advantage. This is not something that is just a prosecution-oriented thing. Firearms evidence can exclude just as well as it can include. One question I have, does the trial court's limitation on the type of opinion that the witness is offering, does that affect our analysis at all? I don't think so because expert witnesses can give opinions even on non-scientific matters. All it has to be is something that's out of the can of the normal everyday person, if they have some expertise. So there's plenty of experts who testify all the time and give an opinion that's not a scientific opinion. It's still an expert opinion, but it may not be a scientific opinion. So whether you call it art or science, and that's a little, the judge, it's a little weird when the judge said, well, you're only comparing things. Well, a lot of science is comparison, observation, description. So it doesn't make it not science because you don't have a mathematical formula or something like that. It's still science. A lot of science is observation and comparison. For the reasons that we've stated here today, Your Honors, and the reasons we put in our briefs, we'd ask that you affirm the defendant's conviction and sentence. Thank you. Thank you. Rebata. Just a few quick comments. Going to the Confrontation Clause, counsel argues that, you know, we shouldn't even reach the testimonial nature of these statements because Dying Declaration is just simply something different. It just doesn't apply. Crawford doesn't apply to it. And he says specifically because the footnote says it's something different. The footnote is not specific in that way. It leaves open, it questions, would Dying Declaration still qualify post-Crawford? That's something that the court has not answered. That's something that Justice Ginsburg has specifically said she would like to address. Given what Crawford says and its progeny and the focus on reliability and cross-examination, I would argue it's something that the courts do need to address because it just simply cannot be squared. Dying Declaration cannot be squared with what we now understand the Confrontation Clause and the Sixth Amendment to require. Then moving to the ongoing emergency, counsel argues, well, you know, there's a perpetrator out there and so they need to catch this person. But the court in Bryant also recognized that, you know, if there's something about what the declarant is saying that signifies that this is a very specific act, then this is a private dispute. And there's no ongoing emergency because Collin says that this person shot me because he said I stole his gun. There's no threat to other people. There aren't other people who have stolen this gun. This is very specific. These are statements made. They're testimonial because they're trying to establish something for trial. Turning to the Frye issue, I think it's kind of silly to say that, you know, in 1930 there is this case that says that ballistics and firearms is just acceptable science. That's like living in a vacuum. We know there's been advances in technology and science since then. The scientific community has questioned whether or not this is reliable science. And the danger here is that we all know juries can hear scientists or experts and they hear what they say. They sound knowledgeable. They take what they say to be the truth. And that's the danger here. Because the experts here testified this is a match. Whoever fired here fired here. It's the same person. That just went to prove the state's generally much weaker case because there's no eyewitnesses to say that Robinson was the perpetrator. Without this firearms evidence, there is no connecting Robinson to this case. But these witnesses that testified at the trial, their opinions or their statements were not based on subjective thoughts. They were based on analytical tests and analysis, were they not? They are experts in the sense that they have training. But the problem is that the court and, in turn, the jury doesn't really understand the limitations of how reliable their ultimate conclusions are. They don't know whether or not the scientific community accepts this training or if they accept that the methodology is what they say it shows or if the premises are right or if you can even say that, you know, just because if you fire from one gun, it will leave different marks all the time and it will tell you specifically to this degree that this is the same gun, the same person fired this gun. The jury is not privy to that information and the trial court here just never considered it. Well, was there a flaw in the methodology utilized here? Was it ever brought to the jury's attention that there was a flaw? There was questions during cross-examination. But, again, the Illinois Supreme Court has recognized that there are limitations to cross-examination in terms of whether or not this is sufficient to challenge these kinds of sciences because, as I said, juries are lay people and they're just handicapped in terms of being able to truly gauge how much credit they should give to this kind of testimony. Thank you, Counselor. Thank you. We will take the matter under advisement. And the court is adjourned. We're going to take a moment to speak to the students. Thank you both.